## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CRISCELI ELIZABETH** | : | |
| **TAYLOR SANCHEZ,** | : | **Civil No.  1:21-CV-2023** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM OPINION</u>

### I.    <u>Introduction</u>

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. See <u>Dickinson v.</u>

Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Crisceli Sanchez applied for disability and disability insurance benefits under Title II of the Social Security Act on September 10, 2019, alleging an onset date of disability of July 24, 2018. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Sanchez was not disabled during the relevant period and denied her application for benefits. Sanchez now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.    **Statement of Facts and of the Case**

Sanchez filed her claim for disability benefits on September 10, 2019, alleging an onset date of July 24, 2018. (Tr. 12). Sanchez alleged disability due to the following impairments: two cervical spinal fusions; chronic neck pain; migraine with aura; cervical radiculopathy; pain of bilateral hands; as well as complaints of

her inability to walk long distances, sit or stand for long periods of time, or sleep because of her pain. (Tr. 44-45). She was 41 years old at the time of her date last insured, had at least a high school education, and had past relevant work experience as a student admissions evaluator. (Tr. 22).

With respect to Sanchez's impairments, the medical record revealed the following: prior to her alleged onset date, Sanchez underwent two cervical spinal fusion procedures, one in 2013 and one in 2016. (Tr. 868). On March 2, 2018, Sanchez had an X-ray of her cervical spine, which revealed no complication of cervical fusion. (Tr. 338). At this time, Dr. Vresilovic at Penn State Milton Hershey Medical Center noted that Sanchez was working full time, but that she had difficulty performing basic care and work independently. (Tr. 321). He further opined that Sanchez had some muscle spasm in her neck, but that there were no structural lesions based on the X-ray findings. (Tr. 434). He recommended conservative measures such as Motrin and Flexeril to help her sleep, as well as physical therapy for her back. (Id.) Sanchez followed up with Dr. Vresilovic at Hershey Medical in May of 2018, complaining of persistent pain and tingling in her right arm. (Tr. 333). On physical examination, Sanchez had 5/5 strength in her bilateral upper extremities, her sensation was intact, and she had minimal tenderness over the lower cervical spine. (Id.) Dr. Vresilovic ordered a bone scan. (Id.)

In June of 2018, Sanchez complained of paresthesias in both arms occurring roughly two times per week. (Tr. 395). Dr. Vresilovic noted that Sanchez was able to ambulate without difficulty, and that the bone scan did not show any backout, failure, or lack of fusion. (Id.) A physical examination revealed that Sanchez had 5/5 strength in all muscle groups with no focal deficits, her sensation was intact, and her neck was minimally tender to palpation. (Id.) Dr. Vresilovic informed Sanchez that there was no clear anatomic or structural deficiency which would cause her symptoms or require a revision surgery, and he recommended that she follow up with chronic pain management. (Tr. 396). Sanchez also saw her treating physician, Dr. Matthew Torres, M.D., in October of 2018, who noted her chronic neck pain and migraine headaches. (Tr. 811). Dr. Torres changed her migraine medication, as he believed her current medication was increasing the frequency and severity of her headaches. (Id.) Regarding her neck pain, Dr. Torres believed that acupuncture might be helpful. (Id.)

A note from the Pain Relief Center in December of 2018 noted that Sanchez's neck pain was constant, and that the severity was moderate. (Tr. 712). However, she reported being able to do many daily activities without difficulty, such as dressing herself, personal care activities, and getting in and out of car. (Tr. 713-14). On

examination, Sanchez exhibited mild pain with her cervical range of motion and a normal gait. (Tr. 717).

In January of 2019, Sanchez received trigger point injections for her myofascial pain syndrome. (Tr. 400). It was noted that her strength in her bilateral upper extremities was 5/5, she had negative facet loading bilaterally, and the trigger points were palpated in the bilateral paracervical and trapezius regions. (Id.) However, in February of 2019, she presented to the emergency room at Hershey Medical with neck pain and tingling in her bilateral upper extremities. (Tr. 393, 484). On examination, she exhibited 5/5 strength in the bilateral upper extremities and intact sensation in all distributions bilaterally. (Tr. 393). It was noted that her physical examination was unremarkable with the exception of some left-sided weakness. (Tr. 391). A cervical X-ray showed no complication of anterior posterior spinal fusion hardware but persistent moderate degenerative change with slight anterolisthesis at C7-T1. (Id.) Around this time, in March of 2019, Sanchez treated with Dr. Torres, who noted that Sanchez was pleased with her medication change for her migraines, and that she should continue her medication regimen until her follow up with pain management for her neck pain. (Tr. 820).

At a follow up in April of 2019, Sanchez complained that the trigger point injections provided no relief and requested to start on new medication. (Tr. 467).

5

She reported neck pain that radiated down her upper extremities with occasional numbness and tingling. (Id.) A physical examination revealed grossly normal tone and muscle strength and a normal gait, full active range of motion, and mild tenderness to palpation over the cervical spine. (Id.) She was started on Gabapentin. (Tr. 468). Treatment notes from a May 2019 visit indicated that Sanchez was still experiencing pain and was interested in trying Cymbalta and a spinal cord stimulator. (Tr. 360). She reported pain with moving her neck left and right and the use of her right arm. (Id.) On physical examination, Sanchez exhibited limited range of motion of her cervical spine, her Tinel's and Phalen's tests were negative, she had positive facet loading bilaterally, and her strength in her upper extremities was 5/5. (Id.) Sanchez was started on duloxetine, and she was referred for an MRI of her thoracic spine. (Tr. 361). However, at a follow up appointment in July of 2019, it was noted that Sanchez had not followed through on her referrals for an MRI, nerve conduction study, or orthopedics due to the fact that Cymbalta was providing her some relief. (Tr. 447).

Sanchez noted at an August 7, 2019 appointment that she was again interested in spinal cord stimulator treatment, as she was experiencing increased pain. (Tr. 440). A musculoskeletal examination revealed grossly normal tone and muscle strength, full active range of motion, and positive tenderness over the bilateral

paraspinal muscles. (Id.) An MRI of the thoracic spine was ordered, and the findings were unremarkable. (Tr. 441, 593-94). Treatment notes from visits in September 2019 indicated that Sanchez was still experiencing pain, but that she was not a candidate for the spinal cord stimulator, although a cervical MRI was ordered to rule out possible nerve compression. (Tr. 587). The cervical MRI showed no spinal canal stenosis at any level, minimal neural foraminal stenosis at C4-C5, but no nerve or spinal cord compression. (Tr. 1011). Sanchez was instructed to follow up with pain management, as surgical intervention was not recommended. (Tr. 1012). Sanchez also had an EMG at this time, which was normal in that there was no evidence of left or right upper extremity mononeuropathy or left or right cervical radiculopathy. (Tr. 574).

Also in September, Sanchez saw Dr. Torres to complete a residual functional capacity questionnaire. (Tr. 829). Dr. Torres diagnosed Sanchez with chronic neck pain and numbness and tingling of both upper extremities. (Tr. 517). He opined that Sanchez's impairments constantly interfered with her attention and concentration to perform even simple work tasks; that she is only capable of handling moderate work stress; she could walk one city block without resting, sit for 20 minutes at a time, stand for 30 minutes at a time, and sit, stand, and walk four a total of 4 hours in an 8-hour day; she would need to get up and walk every 20 minutes for 30 minutes at a

time; she could rarely turn her head left or right, hold her head straight, or lock down her neck; she could never stoop or climb ladders and could rarely climb stairs, twist, crouch, and squat; she had significant reaching, handling, and fingering limitations; and she would be absent 8 or more days per month. (Tr. 517-22). Around this time, Sanchez visited Hershey Medical for a follow up appointment, where it was noted that she was able to move all extremities without difficulty and had a steady gait. (Tr. 549). It was also suggested that she try medical marijuana for her pain. (Id.)

Sanchez presented to the emergency room in October of 2019 complaining of neck pain. (Tr. 539). She reported that she usually had relief from her muscle relaxer and Ibuprofen, but her pain was worse. (Id.) On examination, she had normal range of motion, normal strength, and no focal neurological deficits. (Tr. 541). She was prescribed Toradol and advised to follow up with her primary care physician. (Id.) At a visit with Dr. Torres in December, Sanchez complained of left arm numbness, as well as popping and grinding with movement of her neck. (Tr. 836). Dr. Torres noted she had limited range of motion, and he opined that she may be a candidate for medical marijuana, although she had not been certified yet, as well as further pain management. (Tr. 837). However, a drug screen from January of 2020 revealed the presence of marijuana metabolite not prescribed. (Tr. 743).

8

Sanchez had another MRI of her cervical spine in February of 2020, which revealed no significant central canal or neural foraminal stenosis at C7-T1, and mild right neural foraminal stenosis at C4-C5 unchanged from 9/16/19. (Tr. 749). At a visit to the Pain Relief Center around this time, Sanchez's physical examination revealed moderate pain with range of motion and cervical spine weakness. (Tr. 702). She was scheduled for a facet joint injection. (Tr. 703). An X-ray of the cervical spine in June of 2020 revealed chronic changes of anterior cervical fusion from C5 to C7 and posterior fusion at C6-C7, but no hardware complication or fracture. (Tr. 763). Treatment notes from this time indicate that Sanchez suffered a fall one month prior and her pain had intensified since. (Tr. 764). She reported that her pain was exacerbated with movement of her neck and increased activity, but a physical examination was unable to be completed due to the nature of it being a telephone encounter because of the COVID-19 pandemic. (Id.) However, Sanchez denied any weakness or increased numbness in her bilateral upper extremities. (Id.)

Sanchez was seen by Dr. Torres in July 2020, who noted that Sanchez had joint and neck pain but no tingling or sensory change. (Tr. 843). Dr. Torres discussed different options with Sanchez for her to pursue for her chronic neck pain. (Id.) In August, Sanchez presented to the emergency room complaining of neck pain. (Tr. 1200). A physical examination revealed midline tenderness of lower cervical spine

and lateral left paraspinal cervical tenderness and rightness extending to the thoracic region. (Tr. 1202). An orthopedic consultation noted that while Sanchez had experienced radiculopathy symptoms in the past, she had not had them for quite some time. (Tr. 1182). An X-ray of the cervical spine showed postsurgical changes of C5-C7 and posterior spinal fusion C6-C7 without complication. (Tr. 1208). She was prescribed a Medrol dose pack and advised to maintain follow ups with pain management, as it was determined that no further imaging or intervention was necessary. (Tr. 1203). Sanchez then underwent a cervical medial branch block in August of 2020, but in September, she reported only 25% pain relief. (Tr. 923, 939). She began physical therapy in October of 2020. (Tr. 1397).

Sanchez also continued to treat for her migraines in 2020 into 2021. In August of 2020, she complained of increased migraines that could last a few hours up to a few days. (Tr. 867). Given that she was suffering 12 migraines per month, she was prescribed Topamax and Maxalt. (Tr. 869). She presented to the emergency room in October complaining of a headache that had lasted for two days. (Tr. 1125). She was treated with IV medications for headache and nausea and was discharged in stable condition. (Tr. 1128). In February of 2021, after her date last insured, Sanchez was seen by the Neurology department at Hershey Medical, where it was noted that she had not had significant improvement with her brain fog. (Tr. 1310). She reported

10

blurred vision with her headaches but had no issues with vision loss. (Id.) On examination, her attention and concentration were normal, as were her recent and remote memory. (Tr. 1312). Later in February, she again presented to the emergency room complaining of migraine headaches. (Tr. 1330). An MRI of her brain at this time was unremarkable without acute intracranial abnormality. (Tr. 1308).

It is against this medical backdrop that the ALJ held a telephonic hearing on Sanchez's claim on December 7, 2020, and a supplemental hearing was held on March 23, 2021. (Tr. 29-43, 1423-40). At the hearings, both Sanchez and a Vocational Expert testified. (Id.) By a decision dated April 26, 2021, the ALJ denied Sanchez's application for benefits. (Tr. 9-23).

In that decision, the ALJ first concluded that Sanchez met the insured status requirements under the Act from her alleged onset date of July 24, 2018, through her date last insured, December 31, 2020, and she had not engaged in any substantial gainful activity since her alleged onset date of disability. (Tr. 14). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Sanchez had the following severe impairments: degenerative disc disease and migraines. (Id.) At Step 3, the ALJ determined that Sanchez did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 15-16).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Sanchez's limitations from her impairments:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasionally crawling; never climbing ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme cold, humidity, vibration, dangerous machinery, and unprotected heights.

(Tr. 16).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Sanchez's testimony regarding her impairments. On this score, the ALJ considered the opinions of the state agency consulting sources, Dr. Chevaughn Daniel, M.D., and Dr. David Draper, M.D. Dr. Daniel reviewed Sanchez's records in January of 2020 and opined that Sanchez was capable of light work, in that she could lift and carry up to 20 pounds occasionally and 10 pounds frequently, and she could sit, stand, and/or walk for a total of 6 hours in an 8-hour workday with no other postural limitations. (Tr. 47-49). At the reconsideration level in July of 2020, Dr. Draper opined that Sanchez could perform light work with exertional limitations, in that she could lift and carry up to 20 pounds occasionally and 10 pounds frequently; she could sit, stand, and/or walk for a total of 6 hours in an 8-hour workday; she could never climb ladders, ropes, or scaffolds,

and could occasionally crawl; and she should avoid concentrated exposure to extreme cold, humidity, vibration, and hazards. (Tr. 58-60).

The ALJ found Dr. Daniel's opinion persuasive to the extent it was supported by the records he reviewed at the time of his opinion. (Tr. 20-21). The ALJ found Dr. Draper's opinion more persuasive, as it considered more of the case record and was not contradicted by later acquired records. (Id.) The ALJ reasoned:

> While the claimant has a history of migraines and cervical surgery with associated symptoms of pain and numbness during the period of alleged disability, radiographs failed to reveal any acute processes, need for additional surgery, or evidence of severe canal stenosis or spinal cord compression. Electrodiagno[s]tic testing of the upper extremities was unremarkable, her gait and coordination normal, and she exhibited functional ranges of motion on numerous occasions. She was often found to be neurovascularly intact, even when reporting severe headaches and had no visual field or other visual loss. She endorsed the ability to perform various basic daily routines including driving and shopping. Dr. Draper's assessment is sufficient to accommodate the documented abnormalities caused by her medically determinable impairments as discussed herein.

(Id.)

With respect to Dr. Torres' RFC assessment, the ALJ found this opinion to be unpersuasive. (Tr. 21). The ALJ reasoned that Dr. Torres' extreme limitations were inconsistent with his own treatment records during the relevant time and were further inconsistent with imaging/testing such as EMG, MRIs, and X-rays. (Id.) The ALJ noted that while Dr. Torres assessed greater standing and walking limitations, Sanchez's records typically showed a normal gait and station, as well as full active

range of motion, full strength, and intact sensation. (Id.) The ALJ further noted that while Dr. Torres assessed limitations with concentration and attention, he observed no attentional deficits on examination and other providers found her attention, concentration, and memory to be normal. (Id.)

The ALJ also considered Sanchez's testimony but ultimately found that Sanchez's complaints were not entirely consistent with the medical evidence of record. (Tr. 17-20). Sanchez testified that she was unable to work due to the pain and numbness in her hands. (Tr. 1432). She stated that she could not turn her head, and that sitting and standing too long worsened her neck pain. (Tr. 1433-34). She testified that on a good day she could do light housework and some grocery shopping, but that on bad days she could not get out of bed due to the pain. (Tr 1428-29). She stated that she is able to drive short distances, and that her pain medications sometimes made her tired and she had to nap during the day. (Tr. 1430-31). She also stated that she suffered from migraine headaches, and that she had to lie down in dark areas with no noise. (Tr. 1437).

The ALJ ultimately found that Sanchez's complaints were not entirely consistent with the medical record. On this score, the ALJ noted that Sanchez's physical examinations largely showed normal strength in her upper extremities, intact sensation, and no more than minimal tenderness over the lower cervical spine.

(Tr. 17-18). The ALJ also noted the unremarkable imaging, such as the MRI of her thoracic spine in August of 2019, as well as the EMG and cervical MRI performed in September of 2019. (Tr. 18-19). Regarding her migraines, the ALJ noted that while Sanchez complained of memory deficits, her examinations during the relevant period revealed normal memory, attention, concentration, and comprehension. (Tr. 20). The ALJ also noted her emergency room visits for headaches but stated that her examinations at those times showed no corresponding neurological abnormalities. (Id.)

Having arrived at this RFC assessment, the ALJ found at Step 4 that Sanchez could perform her past relevant work as a student admissions evaluator. (Tr. 22). Alternatively, the ALJ found at Step 5 that Sanchez could perform work available in the national economy as a mail sorter, product sorter, and machine tender. (Tr. 22-23). Accordingly, the ALJ concluded that Sanchez did not meet the stringent standard for disability set by the Act and denied her claim. (Tr. 23).

This appeal followed. (Doc. 1). On appeal, Sanchez contends that the ALJ erred in his assessment of the medical opinion evidence, and further, that the ALJ failed to consider Sanchez's ability to sustain competitive work activities. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

III.   **Discussion**

A.   **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

<u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

18

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the

insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at

*5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in September of 2019 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see

24

20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she

considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June

> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.     The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but

more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large

or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S.

at 565. Judged against these deferential standards of review, we find that substantial

evidence supported the decision by the ALJ that Sanchez was not disabled.

Therefore, we will affirm this decision.

Sanchez presents several arguments, many of which challenge the ALJ's

treatment of the medical opinion evidence. Thus, she contends that the ALJ erred in

his assessment of the opinion evidence, and specifically the opinion of Dr. Torres, Sanchez's treating physician. She also argues in a global fashion that the ALJ failed to consider her ability to sustain competitive work activities.

At the outset, we note that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. When there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15. Finally, it is well settled that: "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006).

Here, we find that the ALJ properly considered the medical evidence of record and provided an adequate explanation for his RFC assessment. The ALJ considered Dr. Torres' September 2019 RFC assessment but ultimately found that this opinion was unpersuasive. The ALJ considered the extremely restrictive limitations as set

forth by Dr. Torres and found that these limitations were not supported by the objective medical evidence, including imaging/testing, such as EMG, MRIs, and X-rays which showed generally unremarkable findings. The ALJ also noted inconsistencies between Dr. Torres' opinion and his own objective examination findings. The ALJ reasoned that while Dr. Torres set forth limitations regarding Sanchez's ability to sit, stand, and walk, the objective examination findings showed a normal gait and station as well as normal examination of the lower extremities. Moreover, while Dr. Torres opined that Sanchez had limitations in her ability to concentrate and maintain attention, the ALJ noted that Sanchez's examinations routinely showed normal concentration, attention, memory, and comprehension. Additionally, the ALJ noted that in July of 2019, Sanchez had not followed through on her referrals for an MRI, nerve conduction study, or orthopedics due to the fact that Cymbalta was providing her some relief. Accordingly, we discern no error with the ALJ's treatment of this medical opinion which seemed to contradict the vast majority of the objective medical evidence of record.

Moreover, the ALJ considered the opinions of the state agency consultants, Dr. Daniel and Dr. Draper, and found these opinions to be persuasive. Specifically, with respect to Dr. Draper's opinion, which set forth less restrictive limitations but limited Sanchez to light work with additional postural limitations, the ALJ found

that this opinion was supported by the medical records up through the time Dr. Draper rendered his opinion in July of 2020 and was not contradicted by evidence acquired after the opinion was rendered. The ALJ explained that his evaluation of these opinions was based on the objective findings of the electrodiagnostic testing, as well as routine findings of normal strength and range of motion in her upper extremities. Moreover, with respect to her migraines, the ALJ noted that while Sanchez reported her migraines, they were unaccompanied by focal deficits or vision loss. The ALJ further noted that Sanchez testified to activities such as driving and shopping. Having discounted Sanchez's treating source opinion the ALJ, however, "did not merely rubber stamp" the other medical opinions in reaching this decision. Chandler, 667 F.3d at 361. Instead, the ALJ individually and critically assessed each of those remaining medical opinions. The ALJ then fashioned a limited light work RFC for Sanchez, but nonetheless found that she could perform this limited range of work.

We are mindful that our " 'review of the ALJ's assessment of the [claimant]'s RFC is deferential,' and the 'RFC assessment will not be set aside if it is supported by substantial evidence.' " Stancavage v. Saul, 469 F. Supp. 3d 311, 339 (M.D. Pa. 2020). On this score, the ALJ was confronted by several medical opinions, which including varying limitations based on the plaintiff's physical impairments. The ALJ

considered all of these opinions against the objective medical evidence in the record and explained why some opinions were more persuasive than others and why he found Dr. Torres' opinion inconsistent with the medical evidence. The ALJ further considered the plaintiff's subjective complaints against the objective medical evidence and concluded that the evidence was not consistent with Sanchez's alleged level of limitation. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Accordingly, we find that the ALJ considered all of the medical evidence and adequately explained his reasoning for the persuasiveness given to the various medical opinions in this case to determine the range of work Sanchez could perform.

Sanchez also argues, in a global fashion, that the ALJ's RFC determination did not meet the requirements of SSR 96-8p.[1] Further, she contends that the ALJ failed to consider her ability to sustain competitive work activities. Much of this argument is based on the ALJ's failure to include limitations in the RFC regarding Sanchez's ability to move her neck and use her hands, her ability to tolerate noise and brightness, and her ability to remain on task and the need for unscheduled

---

[1] "SSR 96-8p requires the ALJ to cite specific medical facts that support his or her residual functional capacity determination." Pearson v. Barnhart, 380 F.Supp.2d 496, 506 (3d Cir. 2005) (citations omitted).

breaks. These restrictions which Sanchez alleges the ALJ did not account for were set forth in Dr. Torres' 2019 opinion. However, as we have explained, the ALJ found Dr. Torres' opinion unpersuasive and gave an adequate explanation for this finding, including citing to specific medical evidence that contradicted Dr. Torres' extreme and work-preclusive limitations. Thus, the ALJ "was not required to adopt every limitation identified by" Dr. Torres. Justin P. v. Kijakazi, 2022 WL 2965857, at *8 (D.N.J. May 31, 2022) (citing Zirnsak, 777 F.3d at 615). Accordingly, we find no error here, and we conclude that the ALJ's decision is supported by substantial evidence.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting de novo might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability

determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV. <u>**Conclusion**</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: March 9, 2023

33